```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA


   SOLAN HOLDING BV,                 :
                                     :
                    et al.,          :    Civil Action
                                     :    No. 1:22-cv-00786
                  Plaintiffs,        :
                                     :
             v.                      :
                                     :
   SYNEXXUS COMPOSITES, INC.,        :    September 26, 2022
                                     :    10:00 a.m.
                    et al.,          :
                                     :
                                     :
                  Defendants.        :
                                     :
   ............................ :
```

**TRANSCRIPT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION HEARING PROCEEDINGS
BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiffs:           **Blair Thornhill Preiser, Esq.**
                              The Lynch law Group, LLC (PA-NA)
                              501 Smith Drive
                              Suite 3
                              Cranberry Township, PA 16066
                              724-776-8000
                              Fax: 724-776-8001
                              Email: Bpreiser@lynchlaw-group.com


                              **Kraig Douglas Jennett, Esq.**
                              Clark Hill PLC
                              1001 Pennsylvania Ave NW
                              Suite 1300 South
                              Washington, DC 20004
                              202-772-0913
                              Email: Kjennett@clarkhill.com

APPEARANCES:  (Cont.)


For the Defendants:              **Jason Ryan Hodge, Esq.**
                                Nelson Mullins Riley &
                                Scarborough, LLP
                                901 East Byrd Street
                                Suite 1650
                                Richmond, VA 23219
                                804-533-3891
                                Email:
                                Jason.hodge@nelsonmullins.com

                                **Matthew Scott Sturtz, Esq.**
                                Nelson Mullins Riley & Scarborough
                                LLP (MD-NA)
                                100 S. Charles Street
                                Suite 1600
                                Baltimore, MD 21201
                                444-392-9400
                                Fax: 443-392-9499
                                Email:
                                Matthew.sturtz@nelsonmullins.com


Court Reporter:                 **Scott L. Wallace, RDR, RMR, CRR**
                                Official Court Reporter
                                United States District Court
                                401 Courthouse Square
                                Alexandria, VA  22314-5798
                                Office: 703.549.4626
                                Cell: 202.277.3739
                                Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

DIRECT EXAMINATION OF GREGORY GLAROS               5
BY MR. STURTZ
CROSS-EXAMINATION OF GREGORY GLAROS               16
BY MS. PREISER
CROSS-EXAMINATION OF GREGORY GLAROS               28
BY MR. STURTZ
DIRECT EXAMINATION OF WILLIAM BURNS                29
BY MR. STURTZ
CROSS-EXAMINATION OF WILLIAM BURNS                 34
BY MS. PREISER

## EXHIBITS

**DESCRIPTION**


Defendants' Affidavit Exhibit admitted             6

Defendants' Exhibit 2 admitted                     10

Plaintiffs' Exhibit 24 admitted                    27

Plaintiffs' Exhibit 25 and 26 admitted             28

1                    .          <u>**MORNING SESSION, SEPTEMBER 26, 2022**</u>

2     (10:07 a.m.)

3          THE COURTROOM CLERK:  Court calls *Solan Holding BV, et al.*

4     *versus Synexxus Composites, Inc. et al.*, Case Number 1:22-cv-786.

5     May I have appearances, please, first for the plaintiff?

6          MR. JEANETTE:  Good morning, Your Honor.  Craig Jeanette

7     for Plaintiff Patrick Coughlin, and also just for today only with

8     the Court's permission and the plaintiffs' consent serving as

9     local counsel for Ms. Preiser.

10         THE COURT:  All right.  Good morning, Mr. Jeanette.

11         MR. JEANETTE:  Good morning.

12         MR. HODGE:  Jason Hodge for Defendants Gregory Glaros and

13     Synexxus, Inc.

14         With me is Mr. Matthew Sturtz, *pro hac vice*.  Good

15     morning.

16         THE COURT:  Good morning.

17         MR. STURTZ:  Good morning, Your Honor.

18         MR. HODGE:  Good morning.

19         THE COURT:  Are we prepared to go forward?

20         MR. STURTZ:  We are, Your Honor.

21         MS. PREISER:  Yes, Your Honor.

22         THE COURT:  And just so it's clear, I expect counsel to be

23     here on time, okay?

24         Are you going to call your first witness?

25         MR. STURTZ:  Thank you, Your Honor.  Your Honor, the

1   defendants call --

2          THE COURT:  Ms. Preiser, did you have something?

3          MS. PREISER:  I was under the impression that Your Honor

4   wanted to hear argument on the motion to dismiss prior to the

5   testimony, but --

6          THE COURT:  No, no, I'm not.  We're resuming the

7   testimony.  Thank you.

8          MR. STURTZ:  Your Honor, the defendants call Gregory

9   Glaros, spelled G-L-A-R-O-S, to the stand.

10              (GREGORY GLAROS, DEFENDANT'S WITNESS, SWORN)

11                  DIRECT EXAMINATION OF GREGORY GLAROS

12  BY MR. STURTZ:

13         MR. STURTZ:  Your Honor, may I approach with two pieces of

14  evidence, one for your law clerk and the other for Your Honor.

15         THE COURT:  Thank you.

16         MR. STURTZ:  May I approach the witness, Your Honor?

17  Thank you.

18  BY MR. STURTZ:

19  Q.    Good morning, sir.  Would you please state your full name

20  for the record.

21  A.    Gregory Glaros, G-L-A-R-O-S.

22         MR. STURTZ:  Your Honor, as a matter of housekeeping, on

23  day two before Your Honor we discussed the admission of the

24  affidavits that were submitted to the Court.  One of those

25  affidavits is Mr. Glaros's affidavit, so I would move its

1    admission at this time.

2          THE COURT:  So received.

3          (Defendants' Affidavit Exhibit admitted into the

4    record.)

5          MR. STURTZ:  Thank you, Your Honor.

6    BY MR. STURTZ:

7    **Q.**    Mr. Glaros, you know that we're here to discuss, amongst

8    other things, the Stiletto boat that was built for the U.S.

9    Navy, so I want to start this conversation with you this morning

10   focusing you on the Stiletto, if I can.

11         Can you tell the Court, please, when did you first get

12   involved with the Stiletto and what was your role?

13   **A.**    Yes, sir.  So the Stiletto was constructed by contract in

14   2004 in the summertime with a delivery in December of 2005.  It

15   was the third vessel that I was put in responsible to from the

16   Department of Defense to build for the Department of Defense.

17   Joint High Speed Vessel was prior to that, and a mechanical

18   dynamic lifting hull that was ducted was the secondary one.

19   Stiletto was the third boat of which I was put in charge of.

20   **Q.**    Okay.  When you say you were put in charge of it, sir,

21   would you describe to the Court what your rank was at the time,

22   what your role was?

23   **A.**    Yep.  I was a Navy commander having served at that point

24   about 17 years in service.  I was a direct report to the

25   Secretary of Defense at the time, and we were selected and

1    directed by our Chiefs of Service to lead programs that our

2    combatant commanders needed to conduct operational needs.

3    **Q.**     Can you explain to Her Honor what the operational need

4    was that the Stiletto was intended to address?

5    **A.**     Yes.  Stiletto was intended to address a couple of

6    challenges that the Department of Defense had, which was

7    lighterage, particularly, which is --

8         THE COURT REPORTER:  I'm sorry.

9         THE WITNESS:  Lighterage, so the ability to move men and

10   equipment in close to shore very quickly.  That was one of the

11   predominant challenges that we had.

12        The second issue was ride quality.  At the time, our

13   Special Forces were getting hammered with IG loads, shock loads

14   on their bodies, almost experiencing tension shock on their

15   bodies, and as a result of that they were blowing out their knees

16   and necks.  So we wanted to mitigate the shock by having a

17   platform that would reduce that impact on their bodies and extend

18   their careers within the Naval service.

19        And then the third one was to explore new materials to use

20   in boats of which carbon fiber had never been used on a large-

21   scale military craft before.  So those were the predominantly

22   three objectives that we needed to meet.

23   BY MR. STURTZ:

24   **Q.**     And, again, you mentioned this earlier in your answer.

25   When was the Stiletto completed?

1  A.    The vessel was launched, which is put in the water, I

2  believe in November or December of 2005 after 15 months under

3  contract, and then I took ownership in April -- March or April

4  of 2006.  I took delivery on behalf of the Department of

5  Defense.

6  Q.    In your role that you have described in the design and

7  construction of the Stiletto, did you, sir, have an opportunity

8  to review and study all of the designs and intellectual property

9  that were created or utilized on the Stiletto?

10 A.    I did.  I not only looked at the Stiletto but many other

11 vessel designs over the years.  We visited virtually every

12 shipyard in the world to allied nations to find out new hull

13 forms, so we were intimately familiar with that particular

14 design.

15 Q.    I have placed in front of you this morning what's been

16 marked as Defendants' Exhibit 2, and I would ask you if you can

17 identify that for the record.

18 A.    This vessel is the Stiletto.

19 Q.    And what are the photographs in Exhibit 2, if you can

20 identify them and go page-by-page?

21 A.    The first vessel is the port side of the Stiletto.  I

22 believe the location here, based on the background, is the Joint

23 Expedition Base Little Creek.

24 Q.    Would you tell Her Honor while we're still on the first

25 picture, how big is the boat that we're looking at in this

1   picture?

2   **A.**     It's deceptive.  It's 90 feet long by 40 feet wide, has a

3   draft of less than one meter, so less than three feet, and has

4   operating speeds up to 50 knots, which is 54 or 55 miles an

5   hour, and the space is almost 80 metric tons.

6   **Q.**     And how many of our troops does it carry?

7   **A.**     Um, it was designed to carry a platoon of Navy SEALs

8   along with their 11-meter, which is a 40-foot rigid-hull

9   inflatable boat, so that it can be disgorged out the back end

10   when this vessel gets closer to a contested area, so again the

11   SEALs didn't get beat up.

12   **Q.**     And what do we see in the second paragraph?

13   **A.**     So the second photo is the Stiletto as well, the

14   starboard side of her.  These waters, based on the 11-meter

15   {indiscernible} right-hand corner looks to be in the Chesapeake

16   Bay area where she's conducting experiments and operations.

17   **Q.**     And what do we see in the third photograph, sir?

18   **A.**     Third photograph, that's the Stiletto, her stern, and

19   from that picture you can see the curtain in the back which

20   allows the vessel, which is 90 feet long, to carry a 40-foot

21   boat inside of her, and this also, based on the pier there, is

22   Joint Experimentation Amphibious Base, Little Creek.

23   **Q.**     And then finally, sir, would you tell Your Honor what

24   we're looking at in the fourth photograph in this exhibit?

25   **A.**     So the last photograph was Stiletto herself on launching,

1    so this probably is dated about November or December of 2005

2    when she was lifted up and placed in the water for the first

3    time.

4    **Q.**    Is the Stiletto still in service today?

5    **A.**    Um, proudly and remarkably so.  After 16 years of use,

6    she still is conducting extensive operations for the U.S. Navy.

7    **Q.**    Is this same type of vessel -- is this the same type of

8    vessel that Composites contracted for to deliver to the Republic

9    of India Navy?

10   **A.**    There's a lot of similarities, but it's not the same

11   boat.

12   **Q.**    Okay.  I want to shift your attention now.

13        THE COURT:  Are you moving in exhibits here?

14        MR. STURTZ:  Yes, Your Honor.  I'm sorry.  I move the

15   admission of Exhibit 2 into evidence.

16        THE COURT:  So received.

17        (Defendants' Exhibit 2 admitted into the record.)

18   BY MR. STURTZ:

19   **Q.**    Mr. Glaros, I'm going to shift your focus now to the

20   intellectual property that was necessary or is necessary to

21   complete the boat for the Republic of India.

22        Would you remind the Court, please, what year did you

23   leave the Navy?

24   **A.**    I retired after 20 years of Naval service as a strike

25   fighter pilot on 1 June 2006 after four combat tours.

1   **Q.**     Since your departure from the Navy, have you continued to

2   study the technology associated with the Stiletto?

3   **A.**     Extensively, and not only the Stiletto, but other vessels

4   that could satisfy that kind of mission.

5   **Q.**     Have you applied for and received patents from the U.S.

6   Patent and Trademark Office for systems that you designed for

7   the Stiletto or Stiletto-type vessels?

8   **A.**     Yeah.  I have right now seven patents, one or two pending

9   right now, and those are predominantly on the modular data

10  distribution system that allows for the integration of any

11  system that's on these boats.

12  **Q.**     Would you be kind enough to explain to us laypeople what

13  you mean by the "integration" of those systems?

14  **A.**     So, one of the -- as a strike fighter pilot, an aircraft

15  is very well integrated.  The integration of that allows a

16  single-seat strike fighter to access anything within that

17  platform.

18          Our armored vehicles and our special operations craft had

19  none of that kind of integration, so I pioneered, designed,

20  fielded, and operated those and patented them for the Department

21  of Defense which allows me to have -- which today is known as an

22  iPhone access or application access to every camera, weapon,

23  radio, or robotic device on those, and it's about the size of a

24  shoebox, is what we created.

25  **Q.**     Who negotiated the contract between Composites and the

1    Republic of India?

2    **A.**     I did.

3    **Q.**     Can you describe for Her Honor, just briefly, how long

4    that process took you to negotiate this contract?

5    **A.**     It was a rather quick one.  It was between four and six

6    months, but in earnest the negotiation was about two months

7    long.

8    **Q.**     If we take a snapshot at the time the contract was

9    entered into in August of 2021 and we come forward to the

10   present, does Composites have all of the intellectual property

11   necessary to design and construct a vessel called for in the

12   contract?

13   **A.**     Categorically.  We have everything that we need.

14   **Q.**     Now, when I use the term IP, how do you understand that

15   term?

16   **A.**     Well, having been through this process extensively and,

17   unfortunately, paid dearly for that with our legal counsel,

18   there are four types of intellectual property that's considered.

19   One of them is design patents.  The other one is utility

20   patents.  There are trademarks.  And then there are trade

21   secrets and know-how.

22   **Q.**     And based on your experience with the Stiletto and now

23   with the vessel for the Navy, do you believe, sir, that

24   Composites possesses all of the necessary IP, as you have

25   defined it, to design and complete the vessel for the Republic

1   of India?

2   **A.**     We do.

3   **Q.**     Can you just briefly explain to the Court what the CRADA

4   is that this Court has heard a fair amount about?

5   **A.**     CRADA stands for Cooperative Research and Development

6   Agreement.  It's an instrument with which the federal government

7   can participate with a company, commercial company to share

8   information between entities legally.

9   **Q.**     Can you explain how the CRADA came about that exists

10  between Synexxus, Inc. and the U.S. Department of Defense?

11  **A.**     It was over a four- or five-year process of discussing --

12  What the Navy wanted to know was, first, how I built and

13  launched this vessel in 15 months for the price that we did.

14          The experience that they had initially was gone and so

15  they wanted to know very specific things about the vessel, the

16  vessel's construction, its insights and, more importantly, what

17  I was developing on our own to advance the vessel and its

18  technology and its performance.

19  **Q.**     Were either you individually or Synexxus, Inc. ever a

20  party to any previous CRADA agreement with the Department of

21  Defense?

22  **A.**     No.

23  **Q.**     Would you please explain to Her Honor how the CRADA plays

24  into the ability of Composites to design the vessel for the

25  India contract?

1    **A.**    Well, Synexxus, Inc. owns the CRADA, has the relationship

2    with the Department of Defense for us to share information from

3    what Synexxus, Inc. develops and what they advance and what Navy

4    wants to earn from that and then particularly what the Navy has

5    learned from the performance of the older prototype Stiletto,

6    both from its operations, its maintenance, and other facets that

7    are outlined in the CRADA that may or may not be considered

8    classified.

9        So in the context of them, Composites being allowed to

10   use that, that was given as a single use of that information to

11   build that boat for the Republic of India in accordance with the

12   Department of Defense's directives.

13   **Q.**    And, in fact, as we stand here today before the Court,

14   has, in fact, the exchange of information been taking place

15   between the Navy and Synexxus, Inc.?

16   **A.**    Yes.  I routinely meet with the U.S. Navy at their

17   facility either on the vessel or in their buildings to discuss

18   and to share the advances that we've made and those things that

19   are advantageous to the Navy as they continue to operate the

20   current vessel.

21   **Q.**    In order to review the information provided to Synexxus,

22   Inc. by the Navy, must one have a security clearance?

23   **A.**    Yes.  Just to enter into the building and facilities, you

24   must.  I have a Top Secret/Special Compartmented Information

25   clearance in order to do that.

1   Q.    During the time that you were negotiating with the

2   Republic of India over the contract, did you take any steps to

3   ensure that, to the extent a contract was awarded, that

4   Composites would have the necessary approvals from the United

5   States government to export a military vessel to India?

6   A.    We did.  We did it in two ways.  One, first, Synexxus,

7   Inc. received advocacy, official advocacy from the Department of

8   State, Department of Commerce, and the Department of Defense,

9   and then we filed for a Technical Assistance Agreement so that

10  we were permitted to share that information with the Republic of

11  India, and then we had Synexxus Composites, by association,

12  particularly myself, being registered on the department of

13  state's Website for that purpose, and then Synexxus Composites

14  was given permission to also share that information, and that

15  was validated by the U.S. Embassy in New Delhi by the Office of

16  Defense Cooperation.

17  Q.    Have you, as we stand here today, taken all of the steps

18  to date that you believe are necessary to export the finished

19  vessel from the United States to the Republic of India?

20  A.    Yes.  We've taken the initial steps.  We received

21  approval for those.  We have drafted the documents necessary for

22  the next steps when it comes in the manufacturing of the vessel

23  which are pretty extensive, and we're prepared to go through

24  that approval process.

25        MR. STURTZ:  Your Honor, I have no further questions for

1    this witness.

2              CROSS-EXAMINATION OF GREGORY GLAROS

3    BY MS. PREISER:

4    Q.    Good morning, Mr. Glaros.

5    A.    Good morning.

6    Q.    We've met.  My name is Blair Preiser.  I'm counsel for

7    Solan Holding.

8              Synexxus, Inc. doesn't have a facilities security

9    officer, does it?

10   A.    I'm sorry, ask the question.

11   Q.    Synexxus, Inc. does not have a facilities security

12   officer; is that right?

13   A.    We do not.

14   Q.    Synexxus Composites does not have a facilities security

15   officer; is that right?

16   A.    We do not.

17   Q.    Does either Synexxus, Inc. or Synexxus Composites have a

18   SCIF?

19   A.    We do not.

20   Q.    Are you familiar with SCIF?

21   A.    I am.

22   Q.    A SCIF is required to view Top Secret information; isn't

23   that right?

24   A.    Yes.  SCIFs are only held by the Department of Defense in

25   their facilities.  We don't have that, nor is it needed.

1    Q.     Are you using classified information to build a boat for

2    the Republic of India?

3    A.     That is difficult to answer in an open forum.  I can -- I

4    can neither confirm nor deny that classified information is used

5    on this vessel.

6    Q.     Are you using proprietary information received from the

7    United States Navy to build a vessel for the Republic of India?

8    A.     Can you define "proprietary"?

9    Q.     Anything that you say is provided to you under the CRADA

10   that you're not permitted to share or view because of a lack of

11   security clearance?

12   A.     I'm sorry, phrase your question for me, please.

13   Q.     Are you using any proprietary information received from

14   the U.S. Navy under the CRADA that those without security

15   clearances would not be able to view in order to build a vessel

16   for the Republic of India?

17   A.     Counsel, I'm not following your question.

18   Q.     Are you using secret government information to build a

19   boat for India?

20   A.     I can neither confirm nor deny classified information

21   that's used on this vessel.

22   Q.     You have a State Department Export license which is

23   limited to nonclassified information, right?

24   A.     That is correct.

25   Q.     And you have a TAA which is issued by the State

1    Department, you just mentioned, which is also limited to

2    nonclassified information; is that right?

3    **A.**     That's correct.

4    **Q.**     And isn't it right that, as part of the contract with

5    India, you are required to turn over all drawings, operations

6    manuals, et cetera, so that they have all information related to

7    this boat?

8    **A.**     That is not correct.

9    **Q.**     That's not correct?

10   **A.**     That is not correct.

11   **Q.**     Let's take a look at, please, what I believe is Defense

12   Exhibit 1.

13          This is the agreement on behalf of Synexxus Composites

14   and has entered into with the Republic of India, Ministry of

15   Defense; is that correct?

16   **A.**     That is correct.

17   **Q.**     And if you look on page 34 under Article 31, it says

18   "Patents and Other Industrial Property Rights."  Do you see

19   that, sir?

20   **A.**     Which page are you on?

21   **Q.**     Page 34.

22   **A.**     Okay.  Which article are you referring to?

23   **Q.**     Article 31.

24   **A.**     Okay.

25   **Q.**     This notes that part of the price paid by India is for

1    the inclusion of the use of all patents, copyrights, registered

2    charters, trademarks and payments --

3          THE COURT REPORTER:  I'm sorry, counsel.  Slow down just a

4    little bit.

5          MS. PREISER:  The amount paid by India is to include

6    payment for the use of patents, copyrights, registered charges,

7    trademarks with payments for any other industrial property

8    rights; is that correct?

9    **A.**    Yes.

10   **Q.**    At some point a plan was to license all of this

11   information to India so that they could build this boat on their

12   own; isn't that right?

13   **A.**    There had been discussions, but there was no agreement

14   either written or implied that were given.  On every --

15   **Q.**    -- sir --

16   **A.**    -- contract --

17   **Q.**    Sir.

18   **A.**    Go ahead.

19   **Q.**    If what you're building requires classified information

20   to build it, you couldn't turn it over to India; is that right?

21   **A.**    That's -- there some parts of that that are correct.

22   **Q.**    And you don't have a sponsor for a clearance, do you?

23   **A.**    I do.

24   **Q.**    Who is your sponsor?

25   **A.**    Naval Sea Systems {indiscernible} or Combatant Craft.

```
 1   Q.     Sponsor you currently for a Top Secret security

 2   clearance?

 3   A.     Yes.

 4   Q.     Under what project?

 5   A.     Under the CRADA.

 6   Q.     Take a look, please, at the other notebook, Plaintiffs'

 7   Exhibit 1.  This is a letter that you sent to Patricia

 8   Kerschbaumer on November 3rd; is that correct?

 9   A.     Where are you looking in the binder, please?

10   Q.     Exhibit 1.

11   A.     Exhibit 1.  Okay.

12   Q.     You sent this letter to Brooke Kerschbaumer on November

13   3, 2021 in response to her questions about various things,

14   including the ownership of the intellectual property on

15   Stiletto; isn't that right?

16   A.     Okay.

17   Q.     Is that correct?

18   A.     Yes.

19   Q.     And number 4 here you say that Synexxus Composites, LLC

20   owns all rights, designs, and all patents, and that's in

21   response to Ms. Kerschbaumer's question, "Who has ownership of

22   the design, including Naval architecture;" is that right?

23   A.     It's stated there, but in the deposition that we gave, I

24   made that correction.  This was a mistake.

25   Q.     That's correct.  You testified at your deposition that
```

1  that was a mistake.  What did you mean to say here, sir?

2  **A.**     Synexxus, Inc.

3  **Q.**     Synexxus, Inc. owns all rights, designs and patents?

4  **A.**     That's correct.

5  **Q.**     Including to the Naval Architecture?

6  **A.**     Yes.

7  **Q.**     And how about where you say under number 2 that, "All

8  rights, patents and designs were transferred to Synexxus

9  Composites, LLC from Synexxus, Inc."?  You testified that was a

10 mistake as well, correct?

11 **A.**     Correct.

12 **Q.**     That actually Synexxus, Inc. is the owner of all of the

13 designs, rights, and patents in the Stiletto boat?

14 **A.**     That's correct.

15 **Q.**     If you would look at Exhibit 2, please.  You provided

16 this portfolio as part of the proof that you provided to

17 Ms. Kerschbaumer and Mr. Elizaga at Solan regarding ownership of

18 intellectual property; is that right?

19 **A.**     I don't know if this is the one because this is an

20 unsigned copy.

21 **Q.**     Unsigned or not, this is the copy that was attached to

22 your November 3rd letter?

23 **A.**     This is for another project.  I'm not sure why that would

24 be the case.

25 **Q.**     Did you create this patent portfolio?

1    **A.**      I did.

2    **Q.**      Do you own all the patents listed on table 3?

3    **A.**      No.

4    **Q.**      Which patents on table 3 do you not own, you being

5    yourself, Synexxus, Inc. or Synexxus Composites?

6    **A.**      Sure.  The -- so if you look at table 3, which are also

7    listed in table 2 but they don't have the names of the first

8    seven patents, and also then there's another one highlighted in

9    red in your chart which is powerboat rooster tail suppressor.

10   **Q.**      I'm sorry.  Are you saying -- can you -- can we go

11   one-by-one which tell me which of these Synexxus, Inc. or

12   Synexxus Composites does not own?

13   **A.**      The m-shaped boat hull.

14   **Q.**      Okay.

15   **A.**      M-shaped boat hull, high speed m-shaped boat hull,

16   powered watercraft, powered watercraft, super-high-speed

17   multihull watercraft, m-shaped boat hull.  And if you move

18   further down, powerboat rooster tail suppressor.

19   **Q.**      But they are included on Synexxus, Inc.'s patent

20   portfolio; is that right?

21   **A.**      Yeah, they're listed, but they're also color-coded.

22   **Q.**      Thank you, sir.  If you look at -- we have some

23   supplemental exhibits.

24          I have one for the Court and one for the clerk.

25          Would you please take a look at what's marked there as

1    Plaintiffs' Exhibit 26.

2         This is part of a document that you provided during a

3    pitch to the Republic of India Navy and Armed Forces September

4    15, 2020; is that right?

5    **A.**    I don't recall ever giving this to the Republic of India.

6    **Q.**    Okay.  Would you look at page 9, please?

7    **A.**    I'm sorry?

8    **Q.**    Page 9, please -- actually, page 10 of that document.

9    This document contains the same patents that we just looked at

10   on the patent portfolio from Synexxus, Inc. that you say now

11   Synexxus, Inc. does not own; is that correct?

12   **A.**    Never did.  They're expired and they're color-coded.

13   **Q.**    Did Synexxus -- Synexxus, Inc. never owned any of these

14   patents?

15   **A.**    No.

16   **Q.**    You presented an assignment agreement from Synexxus, Inc.

17   to Synexxus Composites assigning the rights to these patents,

18   didn't you?

19   **A.**    Can you show me the assignment agreement?

20   **Q.**    Sure.  It's Plaintiffs' Exhibit 3 in the other binder.

21   **A.**    Exhibit 3?

22   **Q.**    Um-hmm.

23   **A.**    Black binder or the white binder?

24        THE COURT:  The black binder, Mr. Glaros.

25        THE WITNESS:  Black?

1   BY MS. PREISER:

2   **Q.**     Um-hmm.

3   **A.**     Okay.

4   **Q.**     This document is signed by you, correct?

5   **A.**     It's signed, but it seems to be doctored because the

6   first four pages do not have pages 1 of 7, 2 of 7, 3 of 7, 4 of

7   7, and only my signature pages appear.  So this is a disjointed

8   document.

9          MS. PREISER:  Your Honor --

10         THE WITNESS:  So, if you look at the bottom right-hand

11  corner --

12         MS. PREISER:  -- this counsel is perfectly able to object.

13  This is a true and correct copy of what we used yesterday and

14  what counsel did not object to then.

15  BY MS. PREISER:

16  **Q.**     Mr. Glaros, does your signature appear on page 7 of this

17  document?

18  **A.**     That is my signature on page 7.

19  **Q.**     Thank you.  And on page 6, does Exhibit A also list a

20  number of those patents that you claim Synexxus, Inc. now never

21  owned?

22  **A.**     Nope.  They're color-coded as well.

23  **Q.**     Does Exhibit A list patents that you now claim Synexxus,

24  Inc. never owned?

25  **A.**     I've never claimed Synexxus, Inc. or I owned any of those

1   patents that are listed here that do not belong to Synexxus,

2   Inc.

3   **Q.**    Are there patents on this list --

4   **A.**    -- yes --

5   **Q.**    -- that Synexxus, Inc. has never owned?

6   **A.**    Yes.

7   **Q.**    Sir, this boat that we're building for India, it isn't

8   ITAR regulated, is it?

9   **A.**    Everything as a defense article that's exported has to be

10  reviewed for ITAR.

11  **Q.**    Is this boat regulated by ITAR?

12  **A.**    The Department of State has to determine that when the

13  export license is issued.

14  **Q.**    I'm going to show you what we've marked in the

15  supplemental binder as Exhibit 24.  This is an e-mail from you

16  to Pamela Schuitema, S-C-H-U-I-T-E-M-A, Tuesday, December 27,

17  2021, copying Timothy Davidson, Patrick Coughlin, Patricia

18  Kerschbaumer where you are sending PNC Bank responses to their

19  questions to you; is that correct?

20  **A.**    That's what this appears, yes.

21  **Q.**    And if you look at page -- many of these pages say 3 of 3

22  as well, but that just happens to be what's in the original.  On

23  the third to last page, what should -- what is the first page

24  marked as page 3 of 3 -- I'm sorry, the second page marked as 3

25  of 3.  She asked you here to explain weaponry as it's described

1   in the contract and Synexxus's function in getting it ready for

2   the weaponry, and what exact weaponry they need to prep it for

3   as they produce it; is that right?

4   **A.**     I'm trying to find where you're --

5   **Q.**     I'm sorry.

6   **A.**     -- where you're referencing.

7   **Q.**     Bottom of -- third page of your letter to PNC.

8   **A.**     Okay.

9   **Q.**     See where she asked you about "weaponry"?

10  **A.**     Does it begin with, "Explain what weaponry --"?

11  **Q.**     Yes.

12  **A.**     Okay.  I'm with you.

13  **Q.**     And if you could just read your response here for a

14  second.

15  **A.**     "Two remote --"

16  **Q.**     If you could read it to yourself, sir.

17  **A.**     Okay.

18  **Q.**     It clearly states to PNC that this is a nonITAR regulated

19  vessel.  Quote, "The vessel is not ITAR regulated and is NOT --

20  in all caps -- on the ITAR munitions list.  No armaments or

21  weapons will be exported.  It's a dual-use craft for both

22  humanitarian assistance due to its shallow draft, high-speed,

23  and significant weight-carrying capacity, as well as the patrol

24  capacity against drug smuggling."  You wrote that, sir?

25  **A.**     I did.

1    **Q.**    Okay.  Take a look at Exhibit --

2         MS. PREISER:  Oh.  I would like to move Exhibit 24 into

3    evidence, Your Honor.

4         THE COURT:  Received.

5         MR. STURTZ:  No objection, Your Honor.

6         (Plaintiffs' Exhibit 24 admitted into the record.)

7    BY MS. PREISER:

8    **Q.**    Take a look at Exhibit 25, please.  This is an

9    intellectual property insurance application form signed by you

10   on March 16, 2022; is that correct?

11   **A.**    Yes.

12   **Q.**    And in this document you claim ownership of specifically

13   two of the patents you just told us that Synexxus, Inc. has

14   never owned; is that correct?

15   **A.**    That is correct.

16   **Q.**    So you told the insurance company you owned patents you

17   did not own; is that right?

18   **A.**    No.  We never issued this.

19   **Q.**    But you listed those patents as patents that Synexxus,

20   Inc. owned; is that right?

21   **A.**    It is.

22        MS. PREISER:  Your Honor, that's all I have.

23        THE COURT:  Are you moving in 25?

24        MS. PREISER:  I'm sorry?

25        THE COURT:  Were you moving in --

1          MS. PREISER:  Yes.  My apologies.  Please, I would like to

2    move Exhibit 25, and if I didn't before, Exhibit 26 into

3    evidence.

4          MR. STURTZ:  Your Honor, I have no objection.

5          THE COURT:  Both are received, 25 and 26.

6          (Plaintiffs' Exhibit 25 and 26 admitted into the record.)

7          MR. STURTZ:  Your Honor, very briefly.

8                    CROSS-EXAMINATION OF GREGORY GLAROS

9    BY MR. STURTZ:

10   **Q.**    Mr. Glaros, do you still have in front of you the patent

11   portfolio, Plaintiffs' Exhibit 2?

12   **A.**    I do.

13   **Q.**    If you would look at the -- it should be titled The

14   Patent Portfolio.  Is that what it is?

15   **A.**    It is.

16   **Q.**    Did counsel during your examination direct you to the

17   tables that have a list of patents?  Can you find that for me,

18   please?

19   **A.**    I have it.

20   **Q.**    Okay.  For the patents that are identified on those lists

21   that are not currently owned by Synexxus, Inc. or that have not

22   expired, are any of those patents utilized in the design or the

23   construction of the vessel to the Republic of India?

24   **A.**    No, none.

25         MR. STURTZ:  I have nothing further, Your Honor.

```
 1        THE COURT:  Mr. Glaros, you may step down.

 2        MR. STURTZ:  Your Honor, we will call Mr. William Burns to

 3   the stand.

 4            (WILLIAM BURNS, DEFENDANT'S WITNESS, SWORN)

 5              DIRECT EXAMINATION OF WILLIAM BURNS

 6   BY MR. STURTZ:

 7   Q.    Good morning, Mr. Burns.

 8   A.    Good morning.

 9   Q.    Would you please state your full name for the record?

10   A.    My name is William Francis Burns, III.

11   Q.    Mr. Burns, the Court does not have any type of affidavit

12   from you, so I want to take just a moment to have you describe

13   to Her Honor your background, and I'd like you to focus your

14   comments on your background as a Naval architect.

15   A.    All right.

16   Q.    Provide just a brief summary for Her Honor your

17   background, sir.

18   A.    Okay, I will.  I have a passion for boat designs.  I have

19   been designing boats for over 30 years.  I founded and led two

20   different companies, boat design companies.  One was a sailboat

21   company called Dyna Yacht, and we developed some very

22   interesting dependent systems for those boats that allow these

23   boats to be some of the fastest racing boats in the world.

24        I also created M Ship Co, which is the company that built

25   the Stiletto.  That is a high-speed design that was originally
```

1   designed to minimize weight damage in the canals of Venice.

2   It's a very interesting story about how it evolved into the

3   military market.  I won't get into that right now, but it's a

4   pretty interesting story to see how designs evolved over time.

5           I've also been an America's Cup designer with two

6   separate campaigns working with Dennis Conner in 1992 and '95.

7   I have over 15 boat design patents, and I have really taken a

8   different approach to Naval architecture that you would find in

9   a normal company.  And personally, I actually look at Naval

10  architecture differently.  We literally throw the book out, the

11  Naval architecture book out the window, and it allows us to

12  really be creative about some of our designs, and that's allowed

13  us to do a lot of interesting work with a lot of very

14  interesting organizations, especially in the U.S. government.

15          So we worked with OFT when we delivered the Stiletto.

16  But we've also worked with the Office of Naval Research.  We've

17  worked with DARFA.  We've worked with the Department of Homeland

18  Security, and even some spooky organizations like DIA and CIA.

19          And along the way we picked up some very nice awards.

20  I'm very proud of the fact that I received an award from *TIME*

21  *Magazine* for developing military design in 2006 and from *Sailing*

22  *World* when I received the Boat of the Year Award in 2001.

23  **Q.**    The award that you received from *TIME Magazine* in 2006,

24  did that award relate to the Stiletto?

25  **A.**    It did, as a matter of fact.

1   Q.    Are you familiar with the patented technologies and other

2   intellectual property that went into the design of the Stiletto?

3   A.    I am.

4   Q.    Okay.  Would you tell the Court, if you can, how many

5   military vessels do you think you've designed in your career as

6   a Naval architect?

7   A.    I probably -- I probably designed over a hundred

8   different boats and platforms, and I would say at least half of

9   those are for the military.

10  Q.    Okay.  Describe your involvement, please, if you would,

11  in the design of the Stiletto.

12  A.    So I was the person who conceptualized the Stiletto and

13  then developed and experimented with the process of optimizing

14  it, and then did the final design to deliver it to the Office of

15  Force Transportation.

16        I also put the team together that allowed us to build

17  this vessel.  No one person can do it, it takes a team, so I was

18  able to put a team together and execute on a very quick timeline

19  something that had never been done before.

20  Q.    As part of the Stiletto design process, Mr. Burns, were

21  patented designs that you created for M Ship Co. used in the

22  design of the Stiletto?

23  A.    Yes, they were.

24  Q.    As of August of 2021, did any of the utility patents

25  utilized in the design or manufacture of the Stiletto still

1    exist?

2    **A.**     They had expired.  They were no longer active.

3    **Q.**     Okay.  And since you obviously own many patents, what

4    does that mean?  Tell the Court, please, when you say those

5    patents had expired.

6    **A.**     When the patent expires, it becomes public domain, so at

7    that point anybody can use that design.

8    **Q.**     So, Your Honor has seen lists of patented technologies.

9    To the extent those patented technologies had expired as of

10   August of 2021, can you tell us, are there any restrictions to

11   anybody using those patents -- that patented technology?

12   **A.**     As a designer, unfortunately, no.

13   **Q.**     Now, today, sir, can you tell Her Honor, what is your

14   present title?

15   **A.**     I am president of Synexxus.

16   **Q.**     And since we have both Synexxus, Inc. and Synexxus

17   Composites before Your Honor, which of the entities are you the

18   president of?

19   **A.**     Synexxus Composites.

20   **Q.**     Synexxus Composites is an LLC, sir.  Are you sure you're

21   the president of Composites or Inc.?

22   **A.**     I misspoke.  It is, Inc., actually.

23   **Q.**     Okay.  When did you first begin your formal employment at

24   Synexxus, Inc.?

25   **A.**     I started earlier this year in the middle of January.

1    **Q.**    Okay.  At the time you joined Synexxus, Inc., was the

2    contract between Composites and the Republic of India already in

3    place?

4    **A.**    It was.

5    **Q.**    Had you, prior to accepting the position of president of

6    Synexxus, Inc., had an opportunity to review that contract?

7    **A.**    I had not.

8    **Q.**    Had you had an opportunity to, prior to joining Synexxus,

9    Inc., review the design for the boat that Composites had

10   contracted to build for the Republic of India?

11   **A.**    I had not.

12   **Q.**    When did you first have an opportunity to review those

13   designs?

14   **A.**    After I joined the company.

15   **Q.**    And after you joined the company, did you, in fact, take

16   it upon yourself to carefully review all of the designs related

17   to the India contract?

18   **A.**    I did.

19   **Q.**    Based upon your review of those designs, did you reach a

20   conclusion as to whether or not Synexxus, Inc. possessed all of

21   the intellectual property that was necessary to design and

22   construct the vessel for the Republic of India?

23   **A.**    I was quite impressed by the amount of work that had gone

24   into it.  As far as IP, I think there was more know-how on how

25   to build the boat and have it operate as an operational craft

1    than when we originally built the boat, so I think there was

2    more know-how and understanding of the design at that point.

3    **Q.**    Are you familiar, sir, with a patent related to m-hull

4    designs that has been referred to in Her Honor's courtroom as

5    the '204 Patent?

6    **A.**    I am.

7    **Q.**    And how are you familiar with the '204 Patent, sir?

8    **A.**    I actually drafted it with a patent attorney and drew the

9    pictures that you see there.

10   **Q.**    Does the '204 Patent that you created and the drawings

11   for which you submitted to the Patent and Trademark Office of

12   Support, does that patent have anything whatsoever to do with

13   the design of the Stiletto?

14   **A.**    No, it does not.

15   **Q.**    Does it have anything whatsoever to do with the design of

16   the vessel that Composites has contracted to provide to the

17   Republic of India?

18   **A.**    No, it does not.

19        MR. STURTZ:   Your Honor, I have no further questions for

20   this witness.

21                    CROSS-EXAMINATION OF WILLIAM BURNS

22   BY MS. PREISER:

23   **Q.**    Good morning, Mr. Burns.

24   **A.**    Good morning.

25   **Q.**    The intellectual property that you referenced related to

1    Stiletto that you were the original architect on.  You assigned

2    all of your rights and all of that intellectual property years

3    ago to your company M Ship Co.; is that correct?

4    **A.**     Not M Ship Co., but actually two different companies.

5    It's typical to assign, even when you own the company, to assign

6    those patents to the company.

7    **Q.**     So what is the other company, Dyna --

8    **A.**     -- A company called --

9         THE COURT REPORTER:  I'm sorry.

10        THE WITNESS:  I'm sorry?

11        THE COURT REPORTER:  I didn't hear you.

12        THE WITNESS:  Dyna Yacht spelled D-Y-N-A, Y-A-C-H-T.

13   BY MS. PREISER:

14   **Q.**     Who owns that company?

15   **A.**     That company was auctioned off to M Ship Co. back in

16   2011, I believe.

17   **Q.**     I'm sorry.  You said that company auctioned off M Ship

18   Co.?

19   **A.**     It was actually purchased by M Ship Co. through an

20   auction.

21   **Q.**     I see.  So -- but you don't currently have any individual

22   rights in any of those patents that were used in Stiletto; is

23   that correct?

24   **A.**     That's correct.  They've all been assigned.

25   **Q.**     So you never assigned the rights of any of those patents

1   to Synexxus, Inc.?

2   **A.**    No, I did not.

3   **Q.**    Did you ever give Synexxus, Inc. permission to use any of

4   those patents?

5   **A.**    No.

6   **Q.**    And at some point, you signed a security agreement

7   between M Ship Co. and the Charles and Meryl Robinson Revokable

8   Trust assigning an interest in all of those patents to the

9   trust; is that right?

10  **A.**    I'm not sure how it related to the trust.  I did sign an

11  agreement with M Ship Co. when I left the company, so I'm

12  assuming that might have been transferred to the trust, but I

13  don't know all of the details about how that happened.

14  **Q.**    So you -- when you say you signed an agreement with M

15  Ship Co. when you left the company, are you saying that you

16  signed an agreement with M Ship Co. that relinquished any rights

17  that you had with those --

18  **A.**    -- that is correct --

19  **Q.**    -- patents?

20       MS. PREISER:  That's all I have, Your Honor.

21       MR. STURTZ:  No redirect, Your Honor.  Thank you.

22       THE COURT:  You may step down, Mr. Burns.  Does that

23  conclude our witnesses?

24       MR. STURTZ:  The defendants have concluded their

25  witnesses, Your Honor.

1          THE COURT:  All right.  And plaintiff as well?

2          MS. PREISER:  Yes, Your Honor.  Thank you.

3          THE COURT:  I wanted to proceed with argument.  Would you

4     all like a ten-minute recess before I do that?

5          MS. PREISER:  Yes, please, Your Honor.

6          THE COURT:  Okay.  I'll give you 15.

7          MS. PREISER:  Thank you.

8          (Thereupon, a recess in the proceedings occurred from

9     11:06 a.m. until 11:51 a.m.)

10          THE COURT:  Okay.  Ms. Preiser, I'll hear from you first.

11          MS. PREISER:  Yes, Your Honor?

12          THE COURT:  I said I'll hear from you first.

13          MS. PREISER:  Your Honor, the fraud in this case is black

14     and white.  The defendant said they owned a bunch of intellectual

15     property related to Stiletto.  They never owned any intellectual

16     property related to Stiletto.

17          The defendants want to make this about whether the IP

18     listed in their portfolios was actually utilized in building this

19     boat or is needed to build this boat.  It's not about that.  They

20     want to make it about military and Top Secret clearances.  It's

21     not about that either.

22          THE COURT:  I have a question for you about which patents

23     are used to actually build the boat.  Wouldn't that go to

24     materiality?

25          MS. PREISER:  Well, the bottom line is, Your Honor, that

1    there's no reason for the defendants to list all of those patents

2    on the portfolio and the assignment and the bank documents and

3    everything that they're using specifically to try to get funding

4    for this product, unless those patents are both owned by the

5    company and necessary for the project.  The only reason that they

6    would even -- in fact, they testified now that these patents have

7    expired, but they went so far as to alter the expiration dates on

8    the assignment agreement that they provided as proof --

9         THE COURT:  But what evidence is there that they altered

10   the dates?

11        MS. PREISER:  Well, Your Honor, the portfolio shows what I

12   believe are mostly accurate dates.  When the assignment agreement

13   was created, all but one of them show dates that have yet to

14   expire.  But if the company doesn't own it and it's not necessary

15   for building the boat, the very project that you're looking for

16   funding for, the only thing that this company does -- it's a one

17   contract company, as the defendants have said, that was created

18   specifically to build this particular boat.

19        You heard Mr. Coughlin say that there's nothing classified

20   about this boat.  You saw that Mr. Glaros told PNC that this was

21   not an ITAR-regulated boat.  Plaintiffs are not seeking the

22   CRADA; they're not seeking classified information.  They have

23   everything they need to build this boat, and when you represent

24   ownership of patents that you don't own in connection with this

25   project seeking money, that's fraud, and that fraud in and of

 1   itself is a huge breach of Mr. Glaros's duties to this company.

 2   But there are two other members of this company.

 3         Mr. Coughlin, Solan, they're ready and able to build this

 4   boat.  Mr. Glaros wants to say he's the only one who can build

 5   this boat, but he's abandoned the project.  He's not building the

 6   boat.  Solan has one final chance by the end of this month to --

 7         THE COURT:  What evidence is there before me that he has

 8   abandoned the project?  You also say in your papers that he has

 9   been mismanaging the company.

10         MS. PREISER:  That's correct.

11         THE COURT:  What evidence is there before me that those

12   things have taken place?

13         MS. PREISER:  So, I forget whether it was actually entered

14   into evidence, but it's in our motion and attached to that that

15   Mr. Glaros has written a letter to India terminating the project.

16         THE COURT:  That he rescinded the next day.

17         MS. PREISER:  Yes, Your Honor, but I don't know how you

18   rescind a termination of a contract.  I think we have said that

19   that was done simply to bring more confusion to this issue, but,

20   regardless, the contract has expired.  Mr. Glaros has not gotten

21   any extension from India.

22         THE COURT:  Okay.  What evidence is there before me that

23   the contract has expired?

24         MS. PREISER:  The terms of the contract itself, Your

25   Honor.

```
1          THE COURT:  Specifically.  I want you to speak
2     specifically, because I want to see what you're relying on in the
3     evidence.
4          MS. PREISER:  Sure.  Defendants' Exhibit 2 has a delivery
5     date of August 31, 2022 for the contract.
6          THE COURT:  But we also know that India has not paid for
7     stage 2 yet.
8          MS. PREISER:  That's correct, Your Honor.
9          THE COURT:  So, aren't there milestones along the way that
10    you have to be hitting and getting paid for --
11         MS. PREISER:  Yes, Your Honor.
12         THE COURT:  -- before the delivery date of August the --
13         MS. PREISER:  Yes, but Solan has negotiated, as you heard
14    from Mr. Elizaga, an extension to build this boat pursuant to new
15    deadlines.  Stage 2 has already been completed.  Synexxus, Inc.
16    received stage 2 completion certificates.  It just was never
17    paid.
18         THE COURT:  Okay.  So they hit that mark and India never
19    paid for it?
20         MS. PREISER:  That's correct, Your Honor.
21         THE COURT:  You can keep going.  I'll let you know when I
22    have questions.  I do have others, but I'm going to let you
23    continue with your argument.
24         While you're looking through your notes, I do have another
25    question for you, because the defense has argued that you are
```

```
 1   seeking a mandatory injunction as opposed to a prohibitory one.

 2   And which are you doing?

 3        MS. PREISER:  Your Honor, it's only prohibitory.  We only

 4   ask that you enjoin Mr. Glaros from any further involvement

 5   specific to the India contract or with the money that is in the

 6   banks that was funded by Solan specifically for the India

 7   contract.

 8        THE COURT:  Okay.  But mandatory -- but this does not seem

 9   to be keeping the status quo, to enjoin them from acting further

10   on the India contract.

11        MS. PREISER:  Your Honor, they're acting now on the India

12   contract.

13        THE COURT:  They haven't been paid.

14        MS. PREISER:  That was not a consideration prior, but,

15   regardless, it's not at issue here.

16        THE COURT:  No, I'm talking about the kinds of relief that

17   you are seeking.  And it looks like it is mandatory in nature if

18   what you are asking for is not about keeping the status quo,

19   because what you're doing is enjoining them from acting on behalf

20   of the LLC which they have been doing.  And I know you take issue

21   with whether or not that's happening currently while they have

22   not been paid, but it is taking away or asking the Court to

23   enjoin them from activity that they otherwise would have the

24   opportunity to be engaging in.

25        MS. PREISER:  Your Honor, we're asking that you prevent a
```

1   man who is actively defrauded his investors, the other members,

2   the customer itself from continuing that fraud and allowing the

3   remaining members to rectify it.

4        THE COURT:  What evidence is there before me that he has

5   defrauded the customer?

6        MS. PREISER:  Well, you heard Mr. Sturtz say just

7   yesterday that -- or not yesterday but Friday that this boat was

8   based only on the intellectual property for Stiletto.

9        THE COURT:  I heard him say that it was not based on the M

10  Ship Co. intellectual property.

11       MS. PREISER:  He said, Your Honor --

12       THE COURT:  But how is that -- because I just want you to

13  be very precise in what your arguments are to the Court so that

14  all of these arguments are based on the record that is before me,

15  either as an exhibit that is attached to your motion or testimony

16  that occurred on the stand, and I did not hear any testimony --

17  and you can correct me if I'm wrong -- about India being

18  defrauded.

19       MS. PREISER:  There was no testimony specifically about

20  India being defrauded, but the contract itself is based on

21  Stiletto, which you've heard multiple witnesses testify that the

22  contract itself is based on Stiletto, and Synexxus Composites,

23  unless they have a right to build a boat based on Stiletto, is

24  still representing to India that they have the right to do that.

25       THE COURT:  But isn't that what the CRADA does?

1           MS. PREISER:  No, Your Honor.  The CRADA has zero

2      relevance to the India contract.  The only reason the CRADA is at

3      issue in this case at all is because Mr. Glaros provided as proof

4      to his investors and the banks to say that the Navy acknowledged

5      his ownership of the intellectual property specifically in

6      Stiletto.

7           That is actually in the CRADA, that Synexxus, Inc. owns

8      all of the intellectual property rights to Stiletto which isn't

9      true, and the CRADA speaks for itself.  If you read the CRADA,

10     there's no transfer of intellectual property rights or patent

11     rights.

12          There's nothing in that document that says the Navy is

13     giving Synexxus, Inc. the right to use Stiletto patents.  The

14     Navy doesn't own the Stiletto patents.  Stiletto patents were

15     owned by M Ship Co.

16          Mr. Burns testified that he assigned all of his rights to

17     M Ship Co., and that they then later assigned those rights

18     elsewhere.  There's nothing in the CRADA that provides that.

19          The CRADA represents Mr. Glaros's representation, false

20     representation to the United States Navy regarding the ownership

21     of the same patents that he is representing now to everyone else

22     that he owns and has since disclaimed ownership in for the first

23     time about a couple of weeks ago.

24          And you heard about -- whether these are the patents that

25     are specifically in use for the India contract or not, they're

1    clearly what was represented to the investors of what was owned

2    and important.  And you heard the testimony of Mr. Coughlin, who

3    said that Mr. Glaros told him that the patents were purchased at

4    the M Ship Co. -- from the M Ship Co. bankruptcy estate.  That

5    clearly isn't true.  You heard from both Ms. Kerschbaumer and

6    Mr. Elizaga that they never would have invested in this company

7    had they believed the specific patents were not owned by the

8    company.

9          So whether or not they are actually in use in this

10   particular boat, the defendants represented to everyone that they

11   were going to be in use for this particular boat or that they

12   were important for this particular boat, and that they were owned

13   exclusively by the company, which is what gave the company its

14   value and what induced Solan to invest millions and then loan

15   millions on top of that, all of which is recoverable if this

16   Court would grant the relief that we're requesting today.

17         THE COURT:  I want to go back to that, because you're

18   saying it's recoverable if the Court grants the relief.  But what

19   you said yesterday or on Friday was that plaintiffs wants -- or

20   India plans to novate the contract, correct?

21         MS. PREISER:  That's correct, Your Honor.

22         THE COURT:  So it's not been -- where would that leave

23   Synexxus Composites?

24         MS. PREISER:  Well, could you clarify what you mean,

25   please?

```
 1        THE COURT:  Well, if they novate the contract, and what

 2   was represented is that then Echo Charlie plans to go forward on

 3   a new and separate contract with India, correct?

 4        MS. PREISER:  That's correct, Your Honor.  Well, Echo

 5   Charlie is owned by Solan.

 6        THE COURT:  I know.

 7        MS. PREISER:  Yes.

 8        THE COURT:  Where does that leave Synexxus Composites?

 9        MS. PREISER:  Exactly where Synexxus Composites is now,

10   which is with no money, no employees, no contract.  But there's

11   no intention to let it remain that way with a ruined reputation

12   and contract breach with vendors and suppliers all over.

13        Solan is trying to make all of that right.  It's not just

14   to the benefit of them, it's to the benefit of Synexxus, LLC, a

15   benefit to Mr. Glaros, a benefit to the employees, et cetera.

16        They would like a chance to fix this mess that Mr. Glaros

17   has made.

18        THE COURT:  I also have a question about the balances of

19   equities in this case, because in your -- in your brief, if I

20   recall correctly, you said there is no harm to defendants if the

21   Court were to grant the injunction.

22        MS. PREISER:  That's correct, Your Honor.

23        THE COURT:  But isn't there harm?

24        MS. PREISER:  No, Your Honor.

25        THE COURT:  Because there are investments on the other
```

1    side, in Synexxus Composites.  And if the contract is just

2    novated and is left there and the Court has enjoined their

3    efforts to continue to participate in the management of the

4    company or to collect on those -- on the contract and what has

5    been -- or Stage 2 to collect that payment, isn't that a harm?

6         MS. PREISER:  Your Honor, there can certainly be no

7    further harm than Mr. Glaros has done to this company himself at

8    this point.  There is no contract.  There is no intellectual

9    property, by his own admission.  Those are the only things that

10   gave this company any value.

11        There, I suppose, has been some infusion of capital at

12   some point by the defendant, but it pales in comparison to the

13   money fraudulently procured from Solan.  The contract is gone.

14   The money will be gone if India drains those accounts.  Synexxus

15   Composites doesn't get that back.  It goes to India because the

16   contract has expired.

17        THE COURT:  But those funds, they're sitting on the bank

18   guaranty.

19        MS. PREISER:  That's correct, they're sitting there, but

20   they're callable on demand by India at the end of this month when

21   they decide that the contract is not going forward.  India will

22   take that money, and then knowing --

23        THE COURT:  But the contract, you said, is not going

24   forward, that the plan is to novate.

25        MS. PREISER:  That's correct, Your Honor.  The contract

1    can go forward, as opposed to terminating and restarting, which

2    is a year or a two-year process, something like that, the

3    contract can go forward under a novation.  But the very members

4    of the company that were totally defrauded by Mr. Glaros, it's

5    inconceivable how he would be permitted to continue to run this

6    company in this contract given that behavior.

7         THE COURT:  And the behavior you're referencing is the

8    statement on the patent portfolio or in the letter to

9    Ms. Kerschbaumer?

10        MS. PREISER:  The company only exists right now, Your

11   Honor, because Solan put up almost $8 million now to keep it

12   running based on their understanding that they were investing in

13   and loaning to a company that had proprietary information related

14   to Stiletto.  That's what was represented to Solan.  That's what

15   was represented to the insurance companies.  That's what was

16   represented to the banks.  It's what was represented to the U.S.

17   Navy, and what was represented to the Republic of India.

18        The entire company and the entire project is based on a

19   lie.  He's never owned those patents.  The company has never

20   owned those patents.  And now there is one that is still

21   proprietary and still unexpired, and, in order to fix this mess,

22   Solan has acquired that single patent, and it's --

23        THE COURT:  But isn't the evidence that that patent is not

24   necessary for building the vessel?

25        MS. PREISER:  Well, Your Honor, it absolutely is necessary

1   for building the vessel.  But even if it were not, the defendants

2   have represented that it is in asking for all this money.  The

3   defendant said, We have proprietary information, nobody else can

4   do this --

5        THE COURT:  Which patent specifically are you referring to

6   now?

7        MS. PREISER:  The D Patent that ends in 204, the design

8   patent.

9        THE COURT:  That's what I thought the testimony was this

10  morning, was that the D Patent was not necessary to building the

11  boat.  You reference -- you call it the D, but the testimony

12  referred to it as the '204.

13       MS. PREISER:  Your Honor, that's in dispute, right,

14  because -- Solan never would have purchased it if it didn't

15  believe it was necessary for this boat, just as they would never

16  have invested if they didn't believe that all of these patents

17  were necessary for this boat, and they had any idea that the

18  patents had been expired and that they were never owned by the

19  company.

20       But it's fraud either way, Your Honor.  Whether it's

21  necessary for the boat or not, it was represented as necessary.

22  There's no other reason.

23       THE COURT:  I understand your argument.

24       MS. PREISER:  Yes.

25       THE COURT:  But when assessing material -- when I'm

1    looking at is this representation material --

2        MS. PREISER:  If you look at the due diligence questions

3    that are posed to Synexxus, Inc., Plaintiffs' Exhibit 1, you see

4    over and over and over again they're asking about the

5    intellectual property, they're asking about who owns it, and

6    they're -- and it's because that's what gives the company its

7    value.

8        THE COURT:  Is that what gives the company its value or is

9    it the fact they have this $33 million contract with India?

10       MS. PREISER:  Well, both, but the $33 million contract

11   with India is based on the fact that they have the exclusive

12   right to build that boat for India and the exclusive right,

13   supposedly, according to them, comes from these --

14       THE COURT:  -- Where in the India contract do they talk

15   about those exclusive rights?

16       MS. PREISER:  Well, it talks about transfer of

17   intellectual property.  They do not list the specific patents in

18   the contract with India; however, he does list the specific

19   patents in the -- in certain pitch materials to India, which you

20   can see in Plaintiffs' Exhibit 1D.  I think it's 26; 26, "Why do

21   you list patents you don't own and aren't necessary --"

22       THE COURT:  The testimony this morning was that they did

23   not provide this to India.

24       MS. PREISER:  They provided it to India, Your Honor, it's

25   just not the -- it's -- my understanding is that this was prior

1    to the decision to build the boat here in the United States.

2          THE COURT:  Do you have more?

3          MS. PREISER:  No, Your Honor.

4          THE COURT:  Did you want to say -- if you could hold one

5    moment.  I want to make sure I've asked all my questions.

6          One thing that has not been addressed in your papers or

7    argument today is the issue of bond, if I were to consider an

8    injunction.

9          MS. PREISER:  Your Honor, Solan is happy to post a bond if

10   Your Honor believes it would be necessary.

11         THE COURT:  It would be necessary.

12         MS. PREISER:  Okay.

13         THE COURT:  The issue is just the amount of bond, then,

14   that would be sufficient, and I think in this case it would be in

15   the millions.

16         MS. PREISER:  Your Honor, just to be clear, no one is

17   asking this Court to enjoin Mr. Glaros from building other boats

18   with Synexxus Composites, either of his companies.  He can go

19   build whatever boats he wants.  We're only asking that he --

20         THE COURT:  You're enjoining him from acting on a

21   $33 million contract.

22         MS. PREISER:  Your Honor, it's $33 million that's expired

23   that Mr. Glaros terminated and has no intention of performing

24   under and can't revive even if he wants to.

25         You heard the testimony of Mr. Elizaga.  India will not

1   work with him, which is why they've required that we get this

2   judicial declaration before they will move forward with people

3   involved with Synexxus Composites.

4        THE COURT:  In a separate contract.

5        MS. PREISER:  Yes, in a novated contract.

6        THE COURT:  With Echo Charlie.

7        MS. PREISER:  Yes, Your Honor, but nothing is -- no one is

8   saying that Synexxus can't go on and do what it wants with any

9   other project it has going on, except that --

10        THE COURT:  What about the reputational harm there would

11   be to Synexxus Composites where they have been enjoined by a

12   court on acting or doing anything on a contract that they have?

13   Who would then want to do business going forward with Synexxus

14   Composites?

15        MS. PREISER:  Your Honor, with all due respect, that

16   damage to Synexxus Composites' reputation has been done.  We're

17   trying to salvage -- Solan is trying to salvage that reputation

18   by actually following through on the promises made by the

19   company.

20        THE COURT:  But how --

21        MS. PREISER:  I'm sorry.  I didn't mean to interrupt you.

22        THE COURT:  Go ahead.

23        MS. PREISER:  The damage has been done.  The shipyard

24   terminated the contract and seized all the materials.  Solan

25   purchased the materials to prevent the dismantling of the mold

1    and another company from buying the materials that they had

2    already purchased, and so now they've bought it twice.

3         They purchased the intellectual property.  They're trying

4    to follow through on their agreements with the shipyard, with the

5    vendors, with the suppliers, with India to salvage some of the

6    reputation that's involved here.

7         THE COURT:  Why wouldn't monetary damages be sufficient to

8    address the fraud claims?  They're against Mr. Glaros

9    individually, for the most part, except for one fraud claim

10   against both Mr. Glaros -- Two of them are against Mr. Glaros and

11   Mr. Burns, so why couldn't monetary damages address those?

12        MS. PREISER:  Well, for one, Your Honor, there's every

13   indication that any monetary damages would not be collectible,

14   and, two --

15        THE COURT:  What evidence is there before the Court that

16   monetary damages against them, Mr. Glaros and Mr. Burns, could

17   not be recovered?

18        MS. PREISER: I would have to think about that, Your Honor,

19   but it's my understanding that the company is broke and

20   threatening bankruptcy.  But, besides that, there's an

21   opportunity here to salvage this contract which is, as it is,

22   would not be a money-making endeavor anymore.  But to salvage the

23   reputation with India and all of these vendors and everybody in

24   this marine space would mean the ability to continue business

25   with those parties as well, and the loss of this contract has the

1    potential to seriously impair the ability of these folks to do

2    that business.

3            THE COURT:  Thank you.

4            MS. PREISER:  Thank you.

5            THE COURT:  I'll hear from you, Mr. Sturtz.

6            MR. STURTZ:  Thank you, Your Honor.  I'll be fairly brief

7    with the Court this afternoon.  Your Honor, the plaintiffs have

8    failed to meet their burden of proof and persuasion in this

9    extraordinary request for relief that they've made.

10           As Your Honor's comments began to indicate, there's a

11   glaring hole in the logic that supports the allegations that have

12   been made before this Court, and that glaring hole is how

13   intellectual property or patents, as it were, listed on certain

14   documents translates into the product that has been promised to

15   the Republic of India.

16           Your Honor offered on Friday that you were ready to move

17   forward without my witnesses.  The reason why I declined Your

18   Honor's offer and put them on the witness stand was because

19   nobody entered this courtroom prior to today with any experience

20   or expertise in the design of either the Stiletto boat or the

21   vessel for the Republic of India, no one.

22           Nobody has testified to this Court that, in fact, the IP,

23   the patents actually that are listed on those documents, are in

24   some way, shape, or form necessary for the construction of the

25   boat for India.  On that list of patents, the last six of those

1    patents are all patents held by Synexxus, Inc.

2         Those are the patents that have been developed since the

3    Stiletto was constructed in order to enhance the systems that

4    operate the boat itself, but not one single person entered this

5    courtroom to tell this Court on behalf of the plaintiffs that any

6    one of those patents on that list, Your Honor, is a required and

7    necessary component of the boat for the vessel in India, not one.

8         Your Honor was very strict with me, understandably, in

9    limiting the questions that I could ask of the plaintiffs'

10   witnesses relating to patents and patent technology.  I fully

11   appreciate why Your Honor would do that, because none of those

12   witnesses has the qualifications, the training, the education, or

13   the experience to even begin to comment to Your Honor about what

14   patented technologies are, in fact, incorporated into the boat

15   for the Republic of India.

16        This morning you heard from two very important people,

17   Mr. Glaros -- and I realize that he's named here -- but

18   Mr. Glaros has literally spent the last 19 years focused first as

19   the overseer of the Stiletto project, which Mr. Burns is also

20   deeply involved in as the Naval architect, but since then through

21   Synexxus, Inc. continuing that process which is what led, of

22   course, Your Honor, to the U.S. Navy recognizing that expertise

23   and entering into the CRADA with Synexxus, Inc. and Mr. Glaros.

24        So Your Honor has received no evidence from the plaintiff

25   that any of the issues that they raise regarding the patented

1   technologies are, in fact, germane to the ability of this entity

2   to design and construct this vessel.

3         THE COURT:  But what plaintiffs have argued is those

4   representations in that patent portfolio is what gave the company

5   or is part of what gave the company value to the plaintiffs.

6         MR. STURTZ:  Really the same question, Your Honor, that

7   I've been addressing, and I will tell you why.  You may recall,

8   when I did the examination of Ms. Kerschbaumer, we pointed out

9   the fact that the due process was all of two days, Your Honor.

10  He signed an NDA on Wednesday and on Saturday forwarded to

11  Mr. Glaros the original note, the first note.

12        No testimony was offered to Your Honor to indicate that in

13  that 48-hour or approximate 48-hour timeframe that the Solan

14  folks retained a Naval architect or anybody else with any type of

15  IP experience to analyze whether or not any of that IP listed

16  was, in fact, incorporated into or necessary for the vessel for

17  India, not one person.

18        It's the exact same problem that they face today in this

19  courtroom.  Only a qualified expert could come into this court

20  and say to Your Honor these things on this list are either

21  incorporated into or necessary for the design or construction of

22  the boat for India.

23        THE COURT:  Then why leave them on the list?

24        MR. STURTZ:  Now that's an interesting question, Your

25  Honor.  That question was never posed to those witnesses that I

1      have put forward.  Now, we did make it very clear to the Court

2      that there are highlighted numbers on there.

3            Now, the reality is all of those patents tied back to the

4      original M Ship Co. patents.  And so if you were to examine the

5      patent portfolio, they all are referenced, and that's why they're

6      listed; not because they actually are incorporated into the final

7      product, but because, for someone like Mr. Glaros who is

8      researching this constantly, new patents come on.

9            And so you look at those new patents to determine whether

10     there's anything in that new patent that may become a necessary

11     item for the boat for India.  If it does, you might reach out and

12     get an assignment or license to use it.

13           But Mr. Burns, the very architect of the Stiletto and the

14     actual inventor of the M Ship Co. patents, sits on this witness

15     stand and tells Your Honor -- unrebutted -- that those patents do

16     not have a role in the design or construction of the boat for

17     India.  It's unrebutted, Your Honor, and he is unquestionably the

18     person most qualified to comment because he is the inventor.

19           That's specifically why I raised with him, Your Honor, the

20     one issue, the '204 Patent, because the testimony before Your

21     Honor was that Solan went out and acquired rights to the '204

22     Patent.

23           Mr. Burns is the inventor of the '204 Patent.  Unrebutted,

24     he said to Your Honor on the witness stand, there's no

25     relationship whatsoever to this boat, none.  There is no other

1   testimony or evidence before Your Honor with regard to those

2   points.  And that's what sits at the very core of the dispute

3   before this Court.  None of those things have anything to do with

4   the boat.  They didn't call a single qualified person to testify

5   that, in fact, what's on any of those lists is required to design

6   or construct the boat for India, none.

7        So that's why we say there is a fundamental and glaring

8   hole in the middle of what they have presented to Your Honor,

9   which defeats the entire motion, because without that there is

10  nothing here to discuss.

11       Now, I will touch upon various elements that Your Honor is

12  very well aware of:  Likelihood of success on the merits.  Not on

13  what's gone on in this courtroom.

14       THE COURT:  What about their breach of their fiduciary

15  duty claim, which is Count -- I think it's the last count in the

16  complaint.

17       MR. STURTZ:  If the alleged fiduciary duty is the

18  fiduciary duty to oversee the execution of this contract, as Your

19  Honor has already pointed out and counsel admitted this morning,

20  the company has completed the milestones for the stage 2 payment.

21       THE COURT:  I don't think that's the crux of their breach

22  of fiduciary duty claim; it's that Defendants Glaros and Burns

23  were making large payments to themselves of the company's funds.

24       MR. STURTZ:  Your Honor --

25       THE COURT:  Now, part of it didn't bear out, because I

1    think they also at some point said there would be a witness here

2    to talk about how they planned to pay Synexxus Inc.'s employees

3    with a 20 percent markup.  I didn't hear any evidence of that.

4         MR. STURTZ:  Your Honor, I'm not aware of any evidence put

5    forth before this Court to indicate how any proceeds of any of

6    the dollars that are involved here were improperly utilized by

7    anybody.  I see the allegation in the papers, but no witness took

8    this witness stand and gave this Court any details on how any

9    amount of money that was funded by them went to the wrong place.

10   So, on the evidence before the Court, there is none that I'm

11   aware of that touches upon that particular aspect of this.  So

12   that certainly, from our standpoint, would not support the

13   extraordinary relief that they're asking this Court for.

14        THE COURT:  Well, is a breach of fiduciary duty only

15   limited to the moneys that they would have put in, or would the

16   breach of the duty go to Synexxus Composites?

17        MR. STURTZ:  I'm not sure I follow where Your Honor is

18   probing there.  The evidence before this Court, there was none

19   presented to the Court regarding any alleged breach of any duty

20   either to Solan as a member or to Composites.

21        The only thing that Mr. Glaros has been doing is focusing

22   on meeting the deliverables in the India contract.  Until you

23   reach a point, like any construction project, Your Honor, if the

24   owner is not paying, then you have every right to stop work until

25   those issues are resolved, and those issues do arise.

```
 1        I'm for sure not telling Your Honor anything that Your
 2   Honor is not aware of.  In a perfect world, everybody would
 3   always fully perform, and everybody would timely be paid.  So
 4   there is a dispute between Composites right now and India right
 5   now on payment.  There's no question about that.  But the fact
 6   that there's this dispute between the two of them certainly is
 7   not a reflection that somehow the management of Composites has
 8   breached some duty, it's simply a matter of contract -- I'll call
 9   it contract administration, Your Honor, and it's not uncommon in
10   construction projects, certainly, or any large project where
11   something is being built for a lot of money, and you work through
12   those issues or you don't, but there's nothing before this Court
13   to suggest that in any way -- in fact, there's been no testimony
14   from anybody on behalf of India, there's been no testimony in
15   this courtroom that India is taking any particular position,
16   because nobody from India representing India appeared in this
17   courtroom.  And so I don't believe that's currently before the
18   Court in the sense that there's no evidence before the Court on
19   that issue for the purpose of this motion.
20        So we don't believe they have shown a likelihood of
21   success on the merits.
22        THE COURT:  Now, in your papers you talk about this being
23   a mandatory injunction, and, of course, plaintiffs dispute this.
24   What makes this mandatory?
25        MR. STURTZ:  Well, as Your Honor was pointing out a few
```

1   moments ago, it's a mandatory one because to maintain the status

2   quo is not what they're asking for.  What they're asking for is,

3   essentially, for this Court to order that Synexxus Composites

4   give up its rights under a contract; permit that same contract to

5   be performed by Solan, and -- I think Your Honor was going down

6   this path, although I didn't get there in the earlier

7   questioning.

8        There's already, as I stand here before this Court, more

9   than $6 million in the stage 2 payment that's due to Composites.

10  You heard counsel admit that that work has been completed by

11  Composites.  Why wouldn't Composites then be the beneficiary of

12  that payment?  That's the status of this matter.  What they're

13  asking for is that there be a novation; they get all of the

14  money, even though they didn't have anything to do with the

15  completion of that stage 2 work; that they go forward and

16  complete the project.

17       Now, Your Honor, you haven't heard a single person who's a

18  Naval architect tell you that they're willing to take that on for

19  them.  You haven't heard a single person come into this courtroom

20  to tell you they have the skill set.  The two gentlemen who

21  testified this morning possess decades of experience with this

22  particular boat, the Stiletto itself.  That's what they bring to

23  the table, and that's the only evidence before this Court as to

24  who moving forward is responsible for the completion of this

25  contract, or I should say the execution, because I don't know

1  whether it's going to be completed.  That's what disputes look

2  like when the person who orders the vessel doesn't pay for it.

3  So I can't tell you, as I stand here, but there's been nobody to

4  come in here to testify that they have the capability --

5      THE COURT:  And I understand your point on that, and I

6  want to be clear.  I'm not focussed on who and whether or not

7  Solan has the ability to do it, because, in all fairness, I

8  limited Mr. Elizaga on that testimony because my focus was on

9  whether we can get to that point.

10     MR. STURTZ:  Sure.  But there is nothing, Your Honor, that

11 prevented them from calling the appropriate person beyond either

12 Mr. Elizaga or Ms. Kerschbaumer to give this Court some

13 indication that they're familiar with these designs, they're

14 familiar with the project, they're familiar with how to build

15 these boats, they're familiar with the intellectual property

16 that's involved, nothing, none of that.

17     Your Honor was right to prevent Mr. Elizaga from

18 testifying to that because he's a private lender from Spain.

19 There was no background upon which Your Honor would base any

20 credibility on him saying what can or can't be done with this

21 boat.  That's not his bailiwick.  It's on them to bring that

22 person into this courtroom, and that never happened, Your Honor.

23 That's why this record is devoid of any support for their central

24 allegation.

25     There's also no evidence before this Court that the

1    balance of convenience falls in their favor.  Your Honor has now

2    heard this morning from the two individuals who were central to

3    the design and construction of the Stiletto, the same boat that

4    in its modern iteration the Republic of India Navy would like to

5    acquire.  That's the only evidence before this Court.  So there's

6    no indication to this Court that anybody else has the ability to

7    actually perform this contract and has control over the broader

8    intellectual property that's required to execute the contract.

9        There's also no evidence before this Court of irreparable

10   injury because all of these claims are for money damages.

11       THE COURT:  Well, they allege that there would be harm to

12   reputation to their customers.

13       MR. STURTZ:  Yes, and I'm astonished by the entire

14   discussion, because we're talking about a military craft.

15   There's no question about that.

16       The suggestion to this Court that somehow the military,

17   the India Navy doesn't put some type of value on the fact that

18   the gentlemen that they're dealing with is the architect from the

19   U.S. Naval side who oversaw the construction and deployment of

20   this vessel.  Of course, the India Navy looks at him and says

21   this man has the credibility to bring this project to fruition.

22   He's done it before.  He was a 20-year man in the U.S. military.

23   Compare that, Your Honor, with the plaintiffs' witnesses.  They

24   have zero military experience, zero experience with this

25   particular craft, and have never exported a military vessel

1    anywhere in the world.  I don't think there can be any doubt,

2    based upon this record, which of these two groups of parties is

3    in the best position to execute and fulfill this contract, if we

4    get to that point, Your Honor.

5         And finally, Your Honor, the last point, public interest.

6    This is an LLC, and we had some discussions with Your Honor about

7    what is it that lies at the heart of this request for either a

8    TRO, as you've denied already, or a preliminary injunction.

9         And I'll just finish with that thought.  This request for

10   relief from Your Honor is a request that the owner of Synexxus

11   Composites, Inc. be precluded from operating that entity.  That's

12   what they're asking this Court for.

13        If there were not that element, Your Honor, this case

14   would be no different from any of the, I'm sure, incredible

15   number of cases that are filed in this courthouse on a regular

16   basis alleging breach of contract, breach of fiduciary duty, and

17   assorted business tort claims, and they all seek money damages.

18        There's nothing unique about those types of cases.  Money

19   makes those people whole.  And we're not even permitted to engage

20   in discovery in aid of enforcement prior to the entry of a

21   judgment, so the whole discussion that goes on that's been

22   filtering through this proceeding about ability to pay, that is

23   not normally a consideration until a judgment is entered in the

24   legal system.

25        So there is no evidence in this record that suggests that

1    if, in fact, in a worst-case scenario for defendants that a

2    judgment is entered, that there's somehow no ability to pay.  But

3    even if that were the case, that is not an element of the request

4    for injunctive relief, because if that were the case, Your Honor,

5    nearly every case where a plaintiff had reason to doubt -- at the

6    end of the day, if I obtain a judgment for millions of dollars

7    against an individual, will I be able to collect; and if not,

8    then I should be able to get a TRO or a preliminary injunction --

9    that is not an element.

10         That sounds more, Your Honor, like an attachment before a

11   judgment proceeding, and that's not why we're here today and

12   that's not been pled to this Court.  From our perspective, they

13   have failed to meet their evidentiary burdens, to demonstrate to

14   the Court the existence of these elements, and for that reason we

15   ask this Court to deny their requested relief.

16         Thank you, Your Honor.

17         THE COURT:  Mrs. Preiser, did you have anything in

18   rebuttal?  Don't feel obligated.

19         MS. PREISER:  No, Your Honor.

20         THE COURT:  So I'm going to take a lunch recess, and we'll

21   resume at 2 p.m. and I'll give my ruling.

22         (Thereupon, a luncheon recess was had beginning at

23   12:44 p.m.)

24

25

1          **<u>AFTERNOON SESSION, SEPTEMBER 26, 2022</u>**

2    (2:33 p.m.)

3          THE COURT:  Thank you, and I apologize for keeping you all

4    waiting.  So this matter is before the Court on Plaintiffs Solan

5    Holding BV and Synexxus Composites, LLC's request for a

6    preliminary injunction, and essentially plaintiff seeks

7    injunctive relief requesting the Court to enjoy defendants and

8    their officers, employees, or anyone acting on their behalf from

9    further interfering with the performance of the India contract or

10   interfering or attempting to interfere with the funds provided by

11   plaintiffs as performance for guarantees.

12         As an initial matter, I'll say that preliminary

13   injunctions are extraordinary remedies, and they should be

14   sparingly granted and in limited circumstances.  That's

15   boilerplate 4th Circuit law.  A party seeking injunctive relief

16   must establish four factors:  One, that they are likely to

17   succeed on the merits; two, they are likely to suffer irreparable

18   harm in the absence of the preliminary relief; three, that the

19   balance of equities weighs in their favor, and that means that

20   the balance of convenience determined by whether greater injury

21   would be done to the defendant by granting the injunction than

22   would result from its refusal; and four, that the preliminary

23   injunction is in the public interest.

24         And those are from the *Posh* case in the 4th Circuit as

25   well as the U.S. Supreme Court *Winter* case.

1        A preliminary injunction can be both mandatory or

2   prohibitive, and I know in this instance the parties dispute

3   whether it's mandatory or prohibitive.  When it's mandatory, it

4   is seeking to alter the status quo, and when it's prohibitive,

5   it's attempting to maintain it.  And when I look at the requests

6   that are here, I see it as altering the normal course of

7   business, and so I find that it is seeking a mandatory injunction

8   here, and those require a more exacting standard of review.  And

9   so the standard that a plaintiff must show of a likelihood of

10  success on the merits is by clear and convincing evidence.  But,

11  to be candid, whether you were seeking mandatory or prohibitive

12  injunction, the issues that I see here and my ruling,

13  essentially, would be the same under either, just to be clear.

14       And so first I turn to success on the merits.  Now, in the

15  briefs and in the arguments before the Court, plaintiff

16  essentially focuses on the fraud claims in terms of arguing the

17  merits of the case; that, as well as the fiduciary duty claim,

18  and plaintiffs argue or claim that in providing the documents in

19  both the November 3rd letter to Ms. Kerschbaumer, as well as in

20  the attachments, that Defendant Glaros falsely represented to

21  Solan, one, that Synexxus Composites owned all of the

22  intellectual property related to the Stiletto, and, two, that the

23  patents related to the Stiletto were in full force and effect.

24  In particular, plaintiff argues that Defendant Glaros lied about

25  owning the M Ship Co. intellectual property.  But for or based on

1    this misrepresentation, Solan entered into the first note, the

2    November 2021 note and then the subsequent notes, and both

3    Ms. Kerschbaumer as well as Mr. Elizaga testified to this during

4    their testimony.

5        Now, those are the -- that's the conduct that they allege

6    that Mr. Glaros engaged in.  Additionally -- now, at that time --

7    Well, Mr. Burns, based on the testimony today, did not become

8    employed by Synexxus, Inc. until January of 2022, which seems to

9    be after the notes, but the allegations as to Mr. Burns are that

10   in February of 2022 he attended a dinner where they discussed

11   these patents and he sat silent while the same misinformation was

12   presented at the dinner and did not correct it.

13       And I'm going to address each of the fraud claims

14   individually.  For Count 1, it's federal securities fraud against

15   Mr. Glaros, and the elements of that claim are that the defendant

16   made a false statement or omission of material fact with scienter

17   upon which the plaintiff reasonably relied that approximately

18   caused the plaintiffs' damages.  That's the *Hall v. Tyco* case

19   where those elements come from.

20       I'll do the Virginia securities fraud claim at the same

21   time, since it's based on the same conduct.  And to establish a

22   claim under the Virginia Securities Act, the plaintiff must plead

23   a material misrepresentation.  That's the *Carlucci* case, 886

24   Supp. 2d Edition 497.

25       Scienter reliance and causation are not required elements

1    under the Virginia securities claim, and both of these claims are

2    based on that November 3rd letter and then those attachments.

3         Now, during his testimony, Mr. Glaros acknowledged that

4    the reference to Synexxus Composites in that November 3rd letter

5    should be Synexxus, Inc., so he's conceded that the letter was

6    not accurate.

7         Now, plaintiff also points out that the defendant did not

8    own all of the patents that are listed in the patent portfolio,

9    and, in fact, that some of them are expired.  There's some

10   changing in the dates, so there's definitely some issues with

11   what is contained in terms of the representations in the letter,

12   but the issue that the Court finds that the plaintiff has not

13   shown a likelihood of success on deals with the materiality.

14        Plaintiffs sought to be part of a project to build a

15   vessel for India, and the unrebutted testimony before the Court

16   is that the defendant owned all of the IP that was necessary to

17   deliver that vessel to India, and none of the, quote-unquote --

18   I'm saying quote-unquote -- questionable, because none of you

19   used the term "questionable patents."  By that I'm using some of

20   those M Ship Co. patents that are identified as -- on the

21   attachment to the letter.

22        None of those patents were required to build the vessel,

23   and that evidence was unrebutted, and that came from both

24   Defendant Glaros and in Defendant Burns's testimony today.

25        And so given the fact that that patent is not required to

1    even build the vessel and the fact that they owned all of the --

2    there's no other evidence -- there's no evidence before the Court

3    that they didn't own all of the patents that were required to

4    build the vessel that they were delivering to India.

5          So, given that, the Court finds that the plaintiff hasn't

6    carried its burden of showing how those specific representations

7    were material.

8          And also, as to Count 1, the federal securities fraud

9    claim, where justifiable reliance is an element, there's no

10   evidence before the Court to show or to establish that plaintiff

11   justifiably relied on the representations that were in those

12   letters because, as the defendant -- as the testimony was in

13   court and as the documents reflect, there doesn't appear to have

14   been any due diligence conducted at the time.

15         And also, as to scienter, which is only an element on

16   Count 1 -- it's not an element on Count 2 -- there was simply no

17   evidence as to scienter at all.  So, for these reasons, the Court

18   finds that plaintiff has not carried its burden of showing a

19   likelihood of success on Counts 1 and 2.

20         Counts 3 and 4 -- Count 3 is a fraud claim also against

21   Defendants Glaros as well as Burns.  Count 4 is the negligent

22   misrepresentation count claim also against Defendants Glaros and

23   Burns, but for the same reasons that I've already stated as to

24   Counts 1 and 2, I find that those same -- the same problems with

25   the evidence before the Court are the lack of evidence in terms

1    of materiality, carry forth, and so I don't believe plaintiff has

2    shown or carried its burden of establishing that it would succeed

3    on Counts 3 and 4.

4        Now, for the breach of fiduciary claim, under Virginia law

5    a manager shall discharge his or its duties as a manager in

6    accordance with the manager's good faith business judgment of the

7    best interest of the limited liability company, and in this case

8    the plaintiff asserts that both Defendants Burns and Glaros --

9    Although, for the breach of fiduciary duty count, it's argued as

10   such in the motion for preliminary injunction -- I believe it

11   relates to Count 11, which is the misappropriation and waste

12   count against Defendant Glaros.  It's not entitled to breach of

13   fiduciary duty, but I believe that that's the count or the claim

14   that you are referencing.

15       And in that the plaintiff alleges or asserts that

16   Defendants Burns and Glaros are paying themselves salary and

17   benefits excessively; that there was also some type of

18   mismanagement of the company and misuse of company funds.

19       Again, the burden is on the moving party in this case, and

20   there was simply no testimony in this hearing about defendant --

21   specifically about Defendant Glaros's breach of any duty to

22   Synexxus Composites.  Both Mr. Elizaga's affidavit and

23   Ms. Kerschbaumer's affidavit include some conclusory statements

24   about mismanagement or his failures, but there's no detail about

25   any mismanagement of the India project.  No one came in here and

1    testified about any specific mismanagement.  There were bank

2    statements attached to plaintiff's motion, but there hasn't been

3    any testimony that connects those line items identified in the

4    bank statements and how they somehow amounted to some

5    inappropriate conduct on the part of Mr. Glaros.

6         And again, it's plaintiffs' burden to show that.  So I

7    don't think that plaintiff has carried their burden of

8    establishing a likelihood of success on the merits on the breach

9    of fiduciary duty claim.

10        Now, in terms of irreparable harm, plaintiff asserts that

11   they will suffer irreparable harm in the form of reputational and

12   professional harm, as well as financial if an injunction is not

13   granted.

14        The Court does not doubt that there can be reputational

15   harm and loss of customers when there are problems with a

16   contract, and I know that there's no suit before me on the India

17   contract, but the reputational harm that you're talking about is

18   if Composites is unable to deliver on the contract to India, and

19   so I don't doubt that there can be reputational harm and a loss

20   of customer harm that can constitute irreparable harm, but I

21   don't think plaintiffs have shown that in this case.  They've

22   sued for money damages, and yes, there can still be reputational

23   harm and loss of customers when you can recover on money damages,

24   but in this case what is very telling -- and plaintiffs are

25   arguing that there will be no company of value left to recover,

1   but what's clear to me, based on some of the representations from

2   counsel, is that there doesn't seem to be a concern about

3   protecting the reputational harm to Composites, LLC, because the

4   intention here is to novate the contract and for there to be a

5   new contract with Echo Charlie.  And so in terms of the -- given

6   the facts here, I just think that that undercuts the argument

7   that there -- that the real concern here is about reputational

8   harm to the company, particularly where in this field plaintiffs

9   may be -- because I think Ms. Kerschbaumer testified about her

10  experience building boats and yachts, but this is a separate

11  field in some ways because it's a specialty.  These are military

12  vessels or vessels that are being turned over on these contracts.

13  It may not be at this point -- this is a totally different field

14  from what she has engaged in in the past.

15       Also, when I look at the balance of equities, they weigh

16  heavily in favor of the defendants in this case.  They would

17  suffer great harm if I were to grant this motion for injunctive

18  relief and not be allowed to follow whatever course appropriate

19  for Synexxus Composites on this India contract in trying to

20  salvage it where they can.  Because what you're asking for is for

21  the Court to enjoin the executives and the people who have been

22  running the company from being able to run it, and they would

23  have -- they would have no recourse with respect to the contract

24  that they negotiated and have delivered on, at least to stage 2,

25  based on your representation that they received the certificate

1     of completion as to stage 2.

2            Finally, the Court finds that it is in the public interest

3     to deny the preliminary injunction because the preservation of a

4     business owner or businessman's interest to operate or an

5     executive to operate his company, in the absence of a clear

6     showing of some type of misconduct, is in the public interest.

7     And so for those reasons I'm going to deny the motion for

8     preliminary injunction.  Your exceptions are preserved.

9            Is there anything further for today?

10            MR. STURTZ:  Nothing from the defendants, Your Honor.

11    Thank you.

12            THE COURT:  Ms. Preiser?

13            MS. PREISER:  Thank you, Your Honor.

14            THE COURT:  Okay.  Thank you.

15            (Proceedings adjourned at 2:55 p.m.)

16                     **C E R T I F I C A T E**

17

18                     I, Scott L. Wallace, RDR-CRR, certify that
             the foregoing is a correct transcript from the record of
19           proceedings in the above-entitled matter.

20

        /s/ Scott L. Wallace              9/28/22
21      ----------------------------      ----------------
        **Scott L. Wallace, RDR, CRR**         **Date**
22          **Official Court Reporter**

23

24

25